## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

SANDRA THERESE KING,

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

CASE NO. 1:20-CV-02705-DAC

MAGISTRATE JUDGE DARRELL A. CLAY

**MEMORANDUM OPINION & ORDER**

### INTRODUCTION

Plaintiff Sandra King filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On July 15, 2021, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #13). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. King filed for DIB on May 10, 2018, alleging a disability onset date of January 1, 2018. (Tr. 72). Her claims were denied initially and on reconsideration. (Tr. 11). She then requested a hearing before an Administrative Law Judge. (Tr. 134). Ms. King (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 1, 2020. (Tr. 54-70).

On April 28, 2020, the ALJ issued a written decision finding Ms. King not

disabled. (Tr. 11-30). The Appeals Council denied Ms. King's request for review, making the

hearing decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 404.955,

404.981). Ms. King timely filed this action on December 4, 2020. (ECF #1).

FACTUAL BACKGROUND

I.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. King and VE David Salewsky, as presented

during the hearing before the ALJ.

Ms. King testified she left her most recent job because she was unable to deal with the

stresses and pressures of employment. (Tr. 58). She offered that a customer hit her in the head

with a loaf of bread. (Tr. 59). Ms. King explained her discomfort with being touched by strangers

and noted that customers would grab her by the arms. (*Id.*). Ms. King also indicated that she says

whatever thought is in her head and has difficulty biting her tongue. (*Id.*). In addition to her

struggles to deal with customers, Ms. King testified she has a challenging time working with

younger co-workers and has "had a lot of confrontation because of that." (Tr. 59-60).

At the time of the hearing, Ms. King was a caregiver to her five-year-old granddaughter. (Tr.

60). Ms. King's boyfriend moved in with her to help with rent and utilities so that the

granddaughter could stay with her. (Tr. 61). Ms. King felt the child's father would take custody of

the child again in the near future. (Tr. 61-62).

Ms. King testified she received spine injections about every two months. (Tr. 62). The

injections worked in the beginning but keep wearing off. (Tr. 62). As a result of the COVID-19

2

pandemic, Ms. King has been unable to see her medical provider and has treated her pain with Advil. (Tr. 62).

Ms. King testified she is unable to stand and walk for the duration of an eight-hour shift. (Tr. 63). Sometimes, she can only stand for 15 minutes before needing to sit down; on other days, Ms. King is able to push through the pain. (*Id.*). She testified she would not be able to lift 50 pounds, but would be able to lift 20 pounds, as long as she did not have to carry the object around. (Tr. 64).

One of Ms. King's medical providers authorized Ms. King to have a disability placard because her legs would give out, causing her to fall. (*Id.*). Ms. King also experiences hand and leg tremors. (*Id.*). Some days are worse than others. (*Id.*). She drops items often. (Tr. 65). Ms. King takes medication for the tremors. (Tr. 64).

Ms. King testified that she experiences fecal and urinary incontinence about two or three times a week. (Tr. 65). Medication helps but does not alleviate the issues. (Tr. 66).

The VE then testified. On review of Ms. King's work record, the ALJ determined Ms. King had not engaged in substantial gainful activity during the relevant period; therefore, Ms. King did not have past relevant work. (Tr. 13, 29, 67). The ALJ asked if the following hypothetical individual could perform any work in the national economy: an individual of Ms. King's age, education, and work experience who is limited to medium work and can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; perform simple tasks and follow short and simple instructions; is limited to superficial interaction with coworkers and supervisors (no judgment decisions, no arbitration or mediation, and no training provided to these individuals); infrequent changes in the workplace setting; and

should not perform in stressful situations as defined by assembly-line work or other strict production quotas. (Tr. 67).

The VE identified three medium work, Specific Vocational Preparation (SVP)[1] 2 positions such a hypothetical individual could perform, including Hospital Cleaner (DOT[2] 323.687-010), Packager (DOT 920.587-018), and Janitor (DOT 381.687-018). (Tr. 67-68).

The ALJ posed a second hypothetical individual that included all of the above-referenced restrictions, but with additional limitations to lifting and carrying 15 pounds occasionally, 10 pounds frequently, and standing and walking no more than six hours in an eight-hour workday. The VE testified that such an individual could not perform medium work positions but could perform less than a full range of light work. (Tr. 68).

The VE further testified that two or more absences per month would be work preclusive, as would being off task up to 15 percent of an eight-hour workday. (Tr. 69).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. King was 53 years old at the time of her alleged onset date, and 55 years old at the time of the hearing. (Tr. 56, 71). Ms. King graduated from high school. (Tr. 29, 58). She was employed as a waitress and bartender, and then as a cashier in a grocery store before her alleged onset date. (*Id.*; Tr. 199).

---

[1]    "SVP" refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

[2]    "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d).

III.    RELEVANT MEDICAL EVIDENCE[3]

On February 5, 2018, Ms. King met with her primary care physician Gasan Nemr, M.D., and complained of shooting lumbar pain that radiates into her right leg. (Tr. 295-96). Ms. King claimed sitting and riding in a car aggravated her pain while walking offered some pain relief. (Tr. 296). Physical examination was normal. (*Id.*). The doctor prescribed a course of prednisone along with Diclofenac, Robaxin, and Tramadol. (Tr. 295).

Ms. King complained of back pain again in December 2018. (Tr. 500). She endorsed aggravation with activity. (Tr. 502). Physical examination was normal. (Tr. 501). Dr. Nemr prescribed a course of methylprednisone for the pain. (Tr. 502).

In January 2019, Ms. King returned to Dr. Nemr's office, noting that her back pain is worse when trying to get up after sitting too long or trying to get out of bed in the morning. (Tr. 508). The pain, described as constant, dull, and aching, radiates down into Ms. King's right hip and thigh. (*Id.*). Dr. Nemr noted the presence of paraspinal spasms, but physical examination was otherwise normal. (Tr. 509). Dr. Nemr diagnosed Ms. King with Lumbago with sciatica on the right and lumbar degenerative disc disease. (Tr. 510). He referred Ms. King to a physical therapist. (*Id.*).

At Ms. King's physical therapy initial assessment, she displayed some painful and dysfunctional spinal ranges of motion. (Tr. 426). Manual muscle testing revealed decreased muscle

---

[3]     Ms. King raises error with respect to the ALJ's determination that she could perform medium work. (Pl.'s Br., ECF #15, PageID 697). More specifically, Ms. King alleges the ALJ improperly evaluated the opinion of James Bircher, D.O., who opined, based on Ms. King's history of back pain and the examination findings, that Ms. King could lift no more than 20 pounds, the maximum lift weight accorded to light work. (*Id.* at PageID 703). I therefore summarize only the records concerning Ms. King's physical impairments.

strength in her lower extremities. (*Id.*). Ms. King completed six physical therapy sessions. (Tr. 425-47). She reported some improvement. (*See* Tr. 437, 440, 444, 447).

In March 2019, Ms. King saw neurologist Michal Gostkowski, D.O., for a hand tremor. (Tr. 449). Ms. King expressed concern about ambulation and mobility and reported some falls from bed when she is sleeping. (Tr. 451). Dr. Gostkowski analyzed Ms. King's gait and noted she could rise from a seated position and initiate gait easily, was able to tandem walk, walk on her heels and tiptoes, walk with her eyes closed, and walk backwards safely. (*Id.*). Dr. Gostkowski determined Ms. King had a leg stereotypy[4] that does not require treatment. (*Id.*).

In December 2019, Ms. King complained to Dr. Nemr that her right leg gives out and she cannot get up using that leg. (Tr. 514). Dr. Nemr noted that an MRI showed multi-level lumbar disc bulging with foraminal stenosis mostly affecting her right side.[5] (*Id.*). Ms. King endorsed less pain on the right side but noted she still had some weakness, even after physical therapy. (*Id.*). Physical examination was normal. (Tr. 517). For leg weakness, Dr. Nemr noted Ms. King was seeing a physical therapist and pain management but might need a spinal surgery "if weakness persists." (*Id.*). Dr. Nemr also authorized Ms. King to use a disability placard (*Id.*).

## IV.  MEDICAL OPINIONS

Ms. King filed her initial claim for DIB based on her bipolar/depression, anxiety, bowel and urinary incontinence, memory loss, lack of concentration, back pain, and numbness and tingling in hands and feet. (Tr. 72, 74-75). A State Agency physician reviewed initial records from

---

[4]     Stereotypies are repetitive and simple movements which can be voluntarily suppressed and are thought to function as calming mechanisms. Examples include repetitive chewing, rocking, twirling, or touching. (Tr. 452).

[5]     The medical record does not contain a copy of the MRI results, only Dr. Nemr's summary of the findings.

Ms. King and her medical providers and consultative examiners. (Tr. 72-74). The Agency physician concluded Ms. King's gastrointestinal disorder, urinary tract disorder, and depressive, bipolar and related disorders were medically determinable impairments, but that the physical impairments were not severe. (Tr. 78). A State Agency psychiatric consultant reviewed Ms. King's records and performed a mental residual functional capacity assessment. The doctor concluded Ms. King was moderately limited in all four categories (understanding and memory, sustained concentration and persistence, social interaction, and adaptation), and opined that Ms. King can follow short and simple instructions, is limited to infrequent changes in work routine, and can interact with others on a superficial basis. (Tr. 78-79, 81-82). In October 2018, the State Agency consultants determined Ms. King did not meet the criteria for disability. (Tr. 85).

At the reconsideration level, another State Agency physician reviewed Ms. King's records and determined Ms. King's gastrointestinal disorder, urinary tract disorder, back disorder, and depressive, bipolar and related disorders were medically determinable impairments, but that the urinary tract and back disorders were not severe. (Tr. 96). The Agency physician performed a residual functional capacity assessment and opined Ms. King could lift and carry 50 pounds occasionally, 25 pounds frequently; stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently stoop, kneel, crouch, and crawl. (Tr. 98-99). Another State Agency consultant reviewed Ms. King's mental health records and concluded that the evidence supports the prior administrative findings. (Tr. 102). In March 2019, the State Agency consultants determined Ms. King was not disabled. (Tr. 105).

In August 2018, Ms. King underwent a consultative psychological evaluation with psychologist Richard N. Davis, M.A. (Tr. 372-76). In his functional assessment, Mr. Davis determined Ms. King's depression may be interfering with her memory problems, as evidenced by the great difficulty she had performing math problems. (Tr. 375). Ms. King was able to respond adequately to most of Mr. Davis' questions but did so slowly and with a somewhat depressed affect. (*Id.*). Mr. Davis found Ms. King did not have difficulty sitting, standing, or moving during the interview. (Tr. 376).

In October 2018, Ms. King attended a consultative examination with James Bircher, D.O. (Tr. 607-12). Ms. King complained of back pain, and x-rays revealed Grade 1 anterolisthesis at L2-L3. (Tr. 607, 611). She reported being able to perform daily activities without difficulty, including bathing, dressing, and feeding herself. (Tr. 611). Dr. Bircher noted Ms. King could lift, carry, and handle light objects; was able to rise from a sitting position without assistance; did not have difficulty getting up and down from the examination table; was able to walk on heels and toes; and did not have difficulty with fine motor coordination and handling. (Tr. 610-11). Based on his findings, Dr. Bircher opined Ms. King can walk, sit, and stand for more than one hour at a time and can lift 20 pounds. (Tr. 611).

In January 2019, Ms. King began physical therapy for low back pain, muscle weakness, and cervicalgia. (Tr. 425-47). The physical therapist, Kathleen Killian, described Ms. King's deficits as global bilateral lower extremity weakness and radicular symptoms into the lower extremities. (Tr. 423). She opined that Ms. King was unable to tolerate moderate-to-heavy lifting due to pain. (*Id.*).

V.     OTHER RELEVANT EVIDENCE

On July 30, 2018, Ms. King filled out an Adult Function Report describing how her conditions limit her activities. (Tr. 206-13). Ms. King stated that depression kept her from wanting to get out of bed, she is hot-headed and has yelled at someone at work, and she suffers from memory loss, confusion, and lack of concentration. (Tr. 206). Sometimes Ms. King stays in her pajamas all day, does not bathe for four or five days in a row, and has incontinence issues. (Tr. 207). Ms. King used to be a much nicer, calmer person but finds herself snapping at others. (*Id.*). Ms. King is able to perform most household chores on her own but only does them if she can talk herself into it. (Tr. 209). Ms. King endorses television as a hobby. (Tr. 210). She used to make repairs around the house, but these projects take months and sometimes they do not get done at all. (*Id.*). Ms. King keeps to herself. (Tr. 211). She does not visit friends, makes an excuse to avoid going out when they call, and tries to avoid the neighbors if she can. (*Id.*).

Ms. King shops for her own groceries but does not go elsewhere on a regular basis. (*Id.*; Tr. 210). She does not pay bills or handle a savings account but can count change and use a checkbook. (*Id.*). Ms. King endorses sometimes forgetting to pay bills on time. (*Id.*). Ms. King uses a pillbox to organize her medicine but sometimes forgets to take her pills. (Tr. 209). Ms. King can prepare her own meals but her effort to do so depends on her mood. (*Id.*). She tries to make at least one meal a day. (*Id.*). Ms. King used to plan a week's worth of meals, but now can only plan on a day-to-day basis. (*Id.*).

Ms. King claims her conditions affect her abilities to stand, sit, complete tasks, concentrate, understand, following instructions, use her hands, and get along with others. (Tr. 211). She also endorses memory issues. (*Id.*). Completing tasks is difficult because she forgets what she is

9

supposed to do. (*Id.*). Ms. King can follow written instructions after reading them a few times and can understand spoken instructions most of the time. (*Id.*). While Ms. King has not been fired because of problems getting along with others, she has come close. (Tr. 212). She finds herself less able to handle stress and hates changes in routine. (*Id.*).

Richard Bird, Ms. King's friend and landlord, completed a Third-Party Adult Function Report on Ms. King's behalf, dated February 18, 2020. (Tr. 274-81). Mr. Bird has known Ms. King for 21 years and currently lives with her. (Tr. 274). He explained he has been her landlord since 2010 and that in 2012 Ms. King agreed to help him fix up a house in exchange for discounted rent. (Tr. 281). This agreement worked until 2018 when Mr. Bird had to make daily trips to the house to make sure Ms. King was completing the repairs. (*Id.*). When Ms. King's granddaughter was put into foster care, Ms. King could only become a caregiver to the child if Mr. Bird moved in with her. (*Id.*). Mr. Bird states Ms. King has a lot of memory loss and he must tell her when and how to do most things. (Tr. 274). Ms. King is unable to tolerate crowds or noise, has panic attacks, falls, and drops things. (*Id.*). Before Ms. King's conditions arose, she could complete all tasks given to her and could control her anger and outbursts. (Tr. 275). Ms. King used to enjoy bowling, taking her dogs to the park, gardening, and doing yardwork. (Tr. 278). Back pain, falling, and grasping issues keep her from these activities. (*Id.*).

Mr. Bird reminds Ms. King to take her medicine and helps get her granddaughter ready for school. (Tr. 275). Ms. King usually starts a light cleaning project, such as laundry or dishes, and makes a simple dinner. (*Id.*). Meals are typically easy, including soups, sandwiches, frozen dinners, hamburgers, and spaghetti. (Tr. 276). It sometimes takes days for Ms. King to complete household

chores, and she will forget to switch loads of laundry for a few days at a time. (*Id.*). She helps her granddaughter with her schoolwork, bathes her, reads to her, and puts her to bed. (Tr. 275).

Ms. King's conditions affect her ability to sleep. (*Id.*). Sometimes she sleeps a lot, and at other times she is awake all night. (*Id.*). Mr. Bird notes that Ms. King can dress herself but will wear the same clothes for days, must be reminded to bathe because she goes days without, and sometimes has toileting accidents. (*Id.*). Mr. Bird reminds Ms. King to pick up her prescriptions. (Tr. 276, 278). Ms. King uses an alarm as a reminder to take her medications, but Mr. Bird always double-checks. (Tr. 276). Mr. Bird also reminds Ms. King to pay her electric bill. (*Id.*).

Mr. Bird will go to the grocery store with Ms. King, a process that takes at least an hour, even when he tries to move her along. (Tr. 277). Ms. King talks with family over the phone, but this is the extent of her social activities. (Tr. 278). Mr. Bird noted Ms. King has problems getting along with family, friends, neighbors, and others because she says whatever she is thinking, which "tends to cause some problems." (Tr. 279). Ms. King makes excuses to avoid going out with friends and goes to family events only if she must. (*Id.*).

Mr. Bird claims Ms. King's conditions affect her abilities to lift, squat, bend, stand, walk, sit, kneel, hear, climb stairs, complete tasks, sustain concentration, understand, follow instructions, use her hands, and get along with others. (*Id.*). He also endorsed memory issues. (*Id.*). Mr. Bird estimated Ms. King can walk five to ten minutes before need to lean on something or sit down. (*Id.*). Ms. King can follow instructions written instructions but has to review them over and over again. (*Id.*). She can follow spoken instructions, but the instructions need to be repeated several times. (*Id.*). Mr. Bird states that Ms. King does not handle stress or changes in routine well. (Tr. 280). If Ms. King is agitated, she ruminates all day, and nothing gets accomplished. (*Id.*).

11

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.     The claimant has not engaged in substantial gainful activity since January 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: Depressive disorder with anxiety, bipolar disorder, anxiety disorder, restless leg syndrome, disorders of the gastro system and urinary tract system, and degenerative disc disease of the back (lumbar spine) (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she can frequently climb ramps and stairs, she can occasionally climb ladders, ropes, and scaffolds, she can frequently stoop, kneel, crouch, and crawl, she is able to perform simple tasks and follow short and simple instructions, she can have only superficial interaction with coworkers and supervisors, meaning no judgment decisions involved, no arbitration or mediation, and no training to be provided to those people, she can have infrequent changes in workplace setting, and she should not perform in a stressful situation as defined as an assembly line work or other strict production quotas.

6.     The claimant has no past relevant work (20 CFR 404.1565).

7.     The claimant was born on April 3, 1964, and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant subsequently changed age category to advanced age (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-30).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a

"zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. King asserts the ALJ did not properly evaluate her residual functional capacity and that "a light RFC is more consistent with and supported by the record based on [Dr. Bircher's] assessment that [Ms. King's] impairments limited her to lifting only 20 pounds." (Pl.'s Br., ECF #15, PageID 703). Ms. King also argues the ALJ did not properly evaluate Dr. Bircher's medical

15

opinion in accordance with 20 C.F.R. § 404.1520c. (*Id.*). The Commissioner responds that the ALJ discussed all relevant evidence and cited to substantial evidence in support of the residual functional capacity for a reduced range of medium work. (Comm'r's Br., ECF #16, PageID 715).

Residual functional capacity is an assessment of an individual's ability to do sustained work-related activities in a work setting on a regular and continuing basis, meaning eight hours per day, five days per week, or an equivalent work schedule. SSR 96-8p. It is the most an individual can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ is responsible for assessing an individual's residual functional capacity. 20 C.F.R. § 404.1546(c). The assessment must be based on all relevant evidence of record, including medical history, signs and laboratory findings, reports of daily activities, recorded observations, and medical opinions. *Id.*; *see also* SSR 96-8p. If the ALJ determines the individual cannot perform or does not have any past relevant work, the ALJ uses the assessment to determine if the individual can adjust to other work that exists in the national economy. 20 C.F.R. § 404.1545(a)(5)(ii). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Here, the ALJ thoroughly reviewed the medical records, medical opinions, and non-medical evidence and concluded Ms. King could perform medium exertion work. That conclusion is well-supported by substantial evidence, including normal physical and neurological examination findings. While Ms. King can point to other evidence that may support a different conclusion, that is of no consequence because even if substantial evidence supports a claimant's position, this court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Ms. King argues the ALJ erred in assessing Dr. Bircher's medical opinion. That medical opinion, limiting Ms. King to lifting 20 pounds, would place her squarely in light exertion work and render her disabled under the Agency's Medical Vocational Guidelines. (Pl.'s Br., ECF #15, PageID 701). Because Ms. King filed her application after March 27, 2017, her case is evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at § 404.1520c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[6] and consistency.[7] *Id.* at § 404.1520c(b). The ALJ must explain how he considered

---

[6]      "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[7]      "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

the factors of supportability and consistency, and if two opinions are equally well-supported and consistent with the record but are not exactly the same, the ALJ will articulate how he considered the "other most persuasive factors," including relationship with the claimant, specialization, and other factors. *Id*. at §§ 404.1520c(b)(2), (3).

Here, the ALJ found Dr. Bircher's opinion unpersuasive because "it is not supported by Dr. Bircher's own clinical findings discussed above or with other clinical findings," including normal back examinations, normal motor strength in the upper and lower bilateral extremities, intact sensory examinations, no focal muscular weakness, and the ability to rise from a seated position easily and walk on tiptoes and heels. (Tr. 26). The ALJ also concluded Dr. Bircher's opinion was "not internally consistent as he noted a 20-pound lifting limitation, but then he stated that [Ms. King] did not have any substantial physical limitations." (*Id*.).

The ALJ found internal inconsistency between two successive statements: (1) "With the patient's history of back pain, based on the exam findings today, the patient is able to walk for over an hour, sit for more than an hour at a time, stand for over an hour, and lift 20 pounds;" and (2) "The patient does not have any substantial physical limitations." (*See* Tr. 611). Ms. King argues the statements are not internally inconsistent because the comment about her not having substantial physical limitations follows the sentence setting forth his opinion as to Ms. King's functional limitations, and in that context the only reasonable reading of the report is that Ms. King does not have *any other* substantial physical limitations. (Pl.'s Br., ECF #15, PageID 703-04).

---

the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

18

I agree with Ms. King's argument; however, the evaluation of Dr. Bircher's medical opinion is nonetheless proper. The ALJ contrasted Dr. Bircher's opinions with the doctor's own examination findings (normal musculoskeletal examination without joint swelling, effusion, tenderness, or deformity; able to lift, carry, and handle light objects; able to rise from a seated position and get up and down from the examination table with ease; normal gait; able to walk on heels and toes) and concluded the normal findings did not support the opined limitations. (Tr. 26, 609-611). The ALJ considered other normal examination findings from the medical record and determined those normal findings also did not support the opined limitations. (*Id.*). Finally, the ALJ noted Dr. Bircher's opinions are not consistent with other evidence of record, including the opinions of the State Agency physicians. (*Id.*).

Ms. King claims the ALJ did not properly consider the x-ray upon which Dr. Bircher relied in forming his opinion. (Pl.'s Br., ECF #15, PageID 704). True, the ALJ did not discuss the x-ray findings showing grade one anterolisthesis in the lumbar spine when concluding Dr. Bircher's opinion was not supported. However, the ALJ did address the findings elsewhere in the opinion. More to the point, the ALJ sufficiently analyzed and adequately explained the supportability and consistency of Dr. Bircher's opinion, and substantial evidence supports the ALJ's determination that the opinion was unpersuasive.

Ms. King also points to a late-2019 treatment note with Dr. Nemr, wherein the doctor noted her MRI showed multilevel lumbar disc bulging and foraminal stenosis, to show Dr. Bircher's opinion was consistent with the medical record, and that the MRI findings are facially inconsistent with standing and walking most of the day and lifting 50 pounds. (*Id.*). Ms. King

asserts the ALJ also erred by relying on the State Agency physician opinion because the Agency physician's review pre-dated the MRI. (*Id.*).

It is not necessary that a non-treating source's opinion be "based on a 'complete' or 'more detailed and comprehensive' case record" in order for the ALJ to credit the opinion. *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. Appx. 997, 1002 (6th Cir. 2011). The ALJ can reasonably credit the State Agency physician's opinion even if the physician lacks access to the entire record so long as the "conclusion that [the claimant] retained the capacity to work was supported by the totality of the medical and vocational evidence of the record." *Glasgow v. Comm'r of Soc. Sec.*, 690 F. Appx 385, 387 (6th Cir. 2017) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. Appx 26, 32 (6th Cir. 2009) ) (concluding that an ALJ may rely on a state agency physician's opinion that is not based on all the record medical evidence "if the ALJ takes into account any evidence that the physician did not consider").

Here, the ALJ determined the State Agency physician's opinion at the reconsideration level was persuasive even though the physician did not have the benefit of reviewing post-dated medical records. However, the ALJ discussed the later-acquired MRI findings in his residual functional capacity assessment. (*See* Tr. 23, 24). The ALJ considered this evidence with other evidence in the record, including the frequent normal physical and neurological examinations. In assessing Ms. King's residual functional capacity, the ALJ weighed those normal findings against the imaging studies and ultimately determined Ms. King could perform medium exertion work with additional limitations. Weighing the evidence of record is within the ALJ's purview, and this Court is not authorized to re-weigh the evidence. *Brainard,* 889 F.2d at 681 (6th Cir. 1989).

Ms. King takes issue with the ALJ's comment that "it is unclear from the treatment records whether the notation about the MRI was from [Ms. King's] reports or Dr. Nemr," arguing that the ALJ attempts to create false confusion on the authenticity of the MRI results. (Pl.'s Br., ECF #15, PageID 705). The ALJ determined Ms. King's degenerative disc disease was a severe impairment at Step Two of the sequential analysis and acknowledged Dr. Nemr's diagnosis of multi-level spinal stenosis. (Tr. 13, 23). Moreover, after diagnosing Ms. King with spinal stenosis, Dr. Nemr authorized her to use a disability placard, but did not offer any other medication, restrictions, limitations, or treatment plans in connection with the diagnosis, suggesting that the MRI does not support any further functional limitation to Ms. King's residual functional capacity assessment. Even if the x-ray noted in Dr. Bircher's opinion and the MRI referenced in Dr. Nemr's treatment notes amount to substantial evidence that supports light or sedentary exertion work, there remains substantial evidence to support the ALJ's determination that Ms. King can perform work at the medium exertion level.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disability insurance benefits is supported by substantial evidence. The Commissioner's decision is **AFFIRMED**.

Dated: March 10, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE